DECISION AND JUDGMENT
{¶ 1} Appellants, Sharen and Michael Gravelle, appeal from their convictions in the Huron County Court of Common Pleas for child endangering. For the reasons that follow, we affirm.
 {¶ 2} Appellants were the adoptive parents of ten until the children were removed from their care in late 2005, after an investigation of appellants' home by the *Page 2 
Huron County Department of Job and Family Services revealed a number of cage-like structures in which the children were allegedly confined. On February 14, 2006, appellants were each separately and identically indicted on 16 counts of child endangering, felonies of the third degree, and eight counts of child endangering, misdemeanors of the first degree. A jury trial commenced on November 28, 2006.
 {¶ 3} Jo Johnson, an investigator for the Huron County Department of Job and Family Services testified that on September 9, 2005, she went to appellants' home to conduct an investigation. The purpose of her visit was to investigate a claim that her agency had received alleging that appellants' children were being kept in cages. When she arrived at the home, she was escorted upstairs by appellant, Michael Gravelle, who showed her the first bedroom used by four of the male children. Johnson testified that she initially noticed a strong urine smell. In the bedroom, there were wooden cages with alarms on the outside. Johnson noted that at least one of the cages lacked a mattress and only contained a blanket. Next, she viewed a bedroom where two of the female children slept. The room contained two wooden cages. The cages were on top of each other. Johnson testified that one of the female children was inside the bottom cage. The other cage was damaged and was covered by a board. Johnson testified that Michael Gravelle told her that the damage was caused when the child inside of the cage attempted to get out.
 {¶ 4} Johnson was then shown a third area where two other male children slept. The entrance to the area consisted of a slatted, wooden door with a baby gate on top. *Page 3 
Next to the entrance, there was a chest of drawers. Michael Gravelle told Johnson that the children had broken the lock on the wooden door so he placed the chest in front of the door so the children could not get out.
 {¶ 5} Johnson testified that appellant, Sharen Gravelle, explained to her that the reason for the cages was that the children "were very bad" and that the cages were needed for the safety of the children as well as for the safety of appellants. Johnson testified that she then left the home and contacted Lieutenant Randall Sommers of the Huron County Sheriffs Department.
 {¶ 6} Based on Johnson's information, Sommers testified that he secured a search warrant for appellants' home and executed it on September 9, 2005. The children were removed from the home and placed in the temporary custody of the Huron County Department of Job and Family Services. Sommers testified that the reason the children were removed was because the children had been held in cages, the risk that the children could not get out of the cages if there was a fire or some other kind of danger, and the strong smell of urine in the home.
 {¶ 7} Huron County Sheriff, Dick Sutherland, testified that he accompanied Sommers to appellants' home on September 9, 2005. The first thing he noticed was locked doors on the kitchen. As he went upstairs, he immediately smelled urine. Upstairs, he observed the sleeping quarters of the children. Sutherland described them as brightly colored wood framed enclosures with chicken wire. There was bedding in some of the enclosures. *Page 4 
 {¶ 8} Fourteen year old M.L. testified that when he lived with appellants, he shared a bedroom with three other boys. He slept in what he described as "an enclosure" with an alarm attached that activated if he tried to leave without permission. The other three boys also slept in similar enclosures without mattresses or pillows. M.L. testified that when he wet his bed, appellants made him sleep in the bathtub for extended periods of time. The bathtub was in the bathroom that M.L. shared with seven of his siblings. M.L. testified that appellants would hose down his sister, S.E., whenever she wet her bed. M.L. testified that this was done to her outside in hot and cold weather. He also testified that his own biological sister, J.O., lived with him and appellants. J.O., M.L. explained, suffers from Down Syndrome. According to M.L., J.O. liked to get frequent drinks of water. Appellants sometimes would stick J.O.'s head in the toilet in response to her water request. If her mouth was open, appellants would stick a sock in her mouth.
 {¶ 9} Four other children took the stand and gave similar testimony regarding the box enclosures and punishments implemented by appellants.
 {¶ 10} Clinical psychologist, Irene Kraegel, testified that she treated four of the male children. She testified that eight year old S.I. frequently talked about sleeping in a cage at appellants' home and expressed anger at being forced to sleep in a cage while there and having meals withheld as punishment. Professional clinical counselor Julie Cashen testified that she treated three of the female children. Eight year old S.E. told Cashen that while at the appellants' home, she was forced to sleep in a box and she was *Page 5 
not allowed to leave it, even to go to the bathroom. She also told Cashen that her box did not have a mattress or a blanket.
 {¶ 11} Clinical and forensic psychologist Sandra McPherson testified that many of appellants' children were initially born to drug or alcohol addicted mothers and suffered abuse and or neglect before being placed with appellants. These preexisting conditions contributed greatly to their behavior later. McPherson testified that the children engaged in indiscriminate urination throughout the house and smeared feces on the wall. In addition, the children engaged in fighting, night wandering and stealing. McPherson characterized these behaviors as extreme and directly related to their initial beginnings before living with appellants. McPherson testified that in her opinion, appellants' use of the enclosed beds was the least restrictive alternative available to appellants given the number of children in their care and the severity of their behavior.
 {¶ 12} Elaine Thompson testified that she is a private therapist. In 2000, appellants contacted her for assistance with their children. Appellants were concerned with the aggressive and impulsive nature of the children's behavior. Many of the children had been diagnosed with reactive attachment disorder ("RAD"). She testified that appellants' children, like many adopted children who were previously abused or neglected, felt unsafe at nighttime. In her opinion, the enclosed beds the children slept in provided them with some sense of security in addition to keeping them safe.
 {¶ 13} Following a jury trial, appellants were each convicted on four counts of felony child endangering, two counts of first degree misdemeanor child endangering and *Page 6 
five counts of first degree misdemeanor child abuse. Appellants now appeal setting forth the following assignments of error:
 {¶ 14} "I. The trial court erred in overruling defendants' motion to suppress evidence, as the search warrant should have been invalidated and all subsequent evidence should have been suppressed.
 {¶ 15} "II. The trial court erred in overruling defendant's motion for a change of venue.
 {¶ 16} "III. The trial court erred by overruling defendants' Rule 29 motions to dismiss.
 {¶ 17} "IV. The trial court erred by overruling defendants' motion for a mistrial based on the prosecutor's closing argument.
 {¶ 18} "V. The verdicts were not supported by sufficient evidence.
 {¶ 19} "VI. The verdicts were against the manifest weight of the evidence."
 {¶ 20} In their first assignment of error, appellants contend that the court erred in denying their motion to suppress. Appellants challenged the validity of a search warrant executed in their home in 2005. Specifically, appellants alleged that the affidavit supporting the issuance of the search warrant was based on false information from an unreliable source which was therefore insufficient to establish probable cause.
 {¶ 21} "In determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, `[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the *Page 7 
affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' (Illinois v. Gates [1983], 462 U.S. 213, 238-239 * * * followed.)" State v. George (1989), 45 Ohio St.3d 325, paragraph one of the syllabus.
 {¶ 22} There is a presumption of the validity of a warrant affidavit, which the defendant can overcome by an offer of proof showing the affidavit contained a knowing, intentional, or reckless falsity.State v. Roberts (1980), 62 Ohio St.2d 170, 178, citing Franks v.Delaware, 438 U.S. 154. In State v. Roberts, supra, the Ohio Supreme Court set forth the circumstances under which a defendant is entitled to a hearing to challenge the veracity of the facts set forth in a warrant affidavit as follows:
 {¶ 23} "[I]n Franks v. Delaware, * * * the United States Supreme Court squarely addressed the issue of when a defendant, under the Fourth Amendment, is entitled to a hearing to challenge the veracity of the facts set forth in the warrant affidavit after the warrant has been issued and executed. The court, at pages 155-156,98 S.Ct. at pages 2676-2677, summarized its holding as follows:
 {¶ 24} "`* * * (W)here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment, requires that a hearing be held at the defendant's request. * * *' *Page 8 
 {¶ 25} "A defendant who seeks to overcome the presumption of validity accorded a warrant affidavit by making a substantial preliminary showing of a knowing, intentional, or reckless falsity, has, underFranks, supra, the task of supporting his allegations by more than conclusional accusations, or the mere desire to cross-examine. Instead, a challenge to the factual veracity of a warrant affidavit must be supported by an offer of proof which specifically outlines the portions of the affidavit alleged to be false, and the supporting reasons for the defendant's claim. This offer of proof should include the submission of affidavits or otherwise reliable statements or their absence should be satisfactorily explained. Even if the above is established, the court inFranks stated that an evidentiary hearing to review the validity of the search warrant is not mandated by the Fourth Amendment if, after the affidavit material alleged to be false is excluded from the affidavit, there remains sufficient content in the affidavit to support a finding of probable cause."
 {¶ 26} The reviewing court should not "substitute its judgment for that of the magistrate's by conducting a de novo determination as to whether the affidavit contains sufficient probable cause upon which the court would issue the search warrant." George at paragraph two of the syllabus. Rather, it is the duty of the reviewing court "simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Id. Great deference should be given to the magistrate's determination of probable cause, and any marginal cases should be resolved in favor of upholding the warrant. Id. *Page 9 
 {¶ 27} In a 20 page opinion, the trial court agreed in part with appellants' allegations that the affidavit supporting the issuance of the search warrant was based on false information from an unreliable source. As such, the trial judge reviewed the affidavit, excluding the allegations the court found to be based on false or unreliable information. What was left was an affidavit sworn by Lieutenant Sommers, stating he had discussed appellants and their adopted children with Jo Johnson, who had recently visited appellants' home. Johnson informed Sommers that there were 11 children, ranging in age from one to 15 years, residing with appellants. The affidavit stated that the children suffered from numerous disorders and illnesses including autism, Down syndrome and human immunodeficiency virus ("HIV"). Johnson informed Sommers that the home smelled strongly of urine and that some of the children slept on mats without bedding instead of beds. Sommers concluded his affidavit noting that, in 29 years, he has investigated several hundred child abuse and neglect cases and that he has received extensive training in child abuse and maltreatment of children. He stated that based on Johnson's observations and his experience, he believed that it was necessary to "* * * enter [appellants] residence and inspect the health and welfare of the children, as well as capture the images of the interior condition of the home by means of photography * * *" for purposes of ensuring the well-being and protection of the children.
 {¶ 28} The elements of R.C. 2919.22(A), child endangering, are as follows:
 {¶ 29} "No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * * shall *Page 10 
create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."
 {¶ 30} In this case, we find that the judge, after excluding large portions of the affidavit, had a substantial basis for concluding that probable cause existed based on the allegations of a strong urine smell in the house, the young ages of some of the children, their special physical and emotional needs, and the allegation that some of the children slept on floor mats instead of beds. Such allegations suggest that appellants violated a duty of care to the children. Accordingly, appellants were not entitled to an evidentiary hearing pursuant toFranks v. Delaware, supra, as their remained sufficient content in the excised affidavit to support a finding of probable cause. Appellants' first assignment of error is found not well-taken.
 {¶ 31} In their second assignment of error, appellants contend that the court erred in denying their motion for a change of venue based on extensive pretrial publicity.
 {¶ 32} A motion for change of venue is governed by Crim. R. 18(B), which provides that "[u]pon the motion of any party * * * the court may transfer an action * * * when it appears that a fair and impartial trial cannot be held in the court in which the action is pending." Crim. R. 18(B) does not require a change of venue merely because of extensive pretrial publicity. State v. Landrum (1990), 53 Ohio St.3d 107, 116-117. The decision to grant or deny a change of venue is in the discretion of the trial court. Id. at 116. *Page 11 
 {¶ 33} It is undisputed that this case generated a large amount of pretrial publicity, both locally and nationally. Appellants cite to the large amount of potential jurors who were stricken for cause as proof that an impartial jury could not be found in Huron County. It is not the stricken potential jurors, however, that guide the court. If potential jurors who were exposed to pretrial publicity do not end up sitting on the jury, the defendant has not been prejudiced by that publicity.State v Roberts, 110 Ohio St.2d 71, 2006-Ohio-3665.
 {¶ 34} It is well-settled that a careful and searching voir dire provides the best test of whether pretrial publicity has prevented the defendant from obtaining a fair and impartial jury from the locality. Id. A defendant claiming that pretrial publicity has denied him a fair trial must show that one or more of the actual jurors were actually biased. State v. Gross, 97 Ohio St.3d 121, 128, 2002-Ohio-5524. Only in rare cases may prejudice be presumed. Mayola v. Alabama (C.A.5, 1980),623 F.2d 992, 997. Finally, where it appears that jurors' opinions as to the guilt of the defendant are not fixed but would yield readily to evidence, it is not error to deny a motion for change of venue, in the absence of a clear showing of an abuse of discretion. State v.Swiger (1966), 5 Ohio St.2d 151, paragraph one of the syllabus. Courts rarely presume prejudice based upon pretrial publicity. State v.Lundgren (1995), 73 Ohio St.3d 474, 479.
 {¶ 35} To further illustrate their point, appellants have focused on six of the actual jurors whom defense counsel unsuccessfully challenged for cause. All six were questioned extensively by the prosecution, defense counsel and the judge. All six were *Page 12 
familiar with the basic facts of the case because of media coverage. All six swore that they could be fair and impartial and could fairly judge the case solely on the facts presented at trial. Based on the foregoing, we cannot say that the trial court abused its discretion in denying appellants' motion for a change of venue. Appellants' second assignment of error is found not well-taken.
 {¶ 36} Appellants' third and fifth assignments of error will be addressed together. In their third assignment of error, appellants contend that the court erred in denying their Crim. R. 29 motion for acquittal. In their fifth assignment of error, appellants contend that the verdicts were supported by insufficient evidence.
 {¶ 37} An appellate court reviews a denial of a Crim. R. 29 motion for judgment of acquittal using the same standard that is used to review a sufficiency of the evidence claim. State v. Carter (1995),72 Ohio St.3d 545, 553. Evidential sufficiency involves an analysis of whether the case should have gone to the jury. See State v. Thompkins,78 Ohio St.3d 380, 386. When examining a claim that there was insufficient evidence to sustain a conviction, the "inquiry is, after viewing the evidence in a light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, 273. Thus, in determining whether a conviction is based on sufficient evidence, an appellate court does not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. See Jenks, supra, at paragraph two of the syllabus; State v. Yarbrough, 95 Ohio St.3d 227, *Page 13 2002-Ohio-2126, ¶ 79 (noting that courts do not evaluate witness credibility when reviewing a sufficiency of the evidence claim).
 {¶ 38} Appellants first contend that the evidence was insufficient to convict them of endangering children pursuant to R.C. 2919.22(B)(1), because the state failed to put forth evidence of "serious physical harm" as that term is defined in R.C. 2901.01(A)(5)(a)-(e). This argument is without merit as the state was not required to put forth evidence of "serious physical harm" to convict appellants of R.C. 2919.22(B)(1). The elements of the offense are as follows:
 {¶ 39} "No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:
 {¶ 40} "Abuse the child;"
 {¶ 41} R.C. 2151.03.1 defines an abused child as:
 {¶ 42} "any child who:
 {¶ 43} "(A) Is the victim of "sexual activity" as defined under Chapter 2907. of the Revised Code, where such activity would constitute an offense under that chapter, except that the court need not find that any person has been convicted of the offense in order to find that the child is an abused child;
 {¶ 44} "(B) Is endangered as defined in section 2919.22 of the Revised Code, except that the court need not find that any person has been convicted under that section in order to find that the child is an abused child; *Page 14 
 {¶ 45} "(C) Exhibits evidence of any physical or mental injury or death, inflicted other than by accidental means, or an injury or death which is at variance with the history given of it. Except as provided in division (D) of this section, a child exhibiting evidence of corporal punishment or other physical disciplinary measure by a parent, guardian, custodian, person having custody or control, or person in loco parentis of a child is not an abused child under this division if the measure is not prohibited under section 2919.22 of the Revised Code.
 {¶ 46} "(D) Because of the acts of his parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare.
 {¶ 47} "(E) Is subjected to out-of-home care child abuse."
 {¶ 48} R.C. 2919.22(E)(2)(a) makes R.C.2919.22(B)(1) a misdemeanor offense of the first degree unless the violation results in serious physical harm. In which case, the violation is a felony of the second degree. R.C. 2919.22(E)(2)(d). Here, appellants were convicted of the misdemeanor offense of endangering children, child abuse, and therefore, the state was not required to set forth evidence of "serious physical harm." Appellants argue that because R.C. 2151.03.1 refers to R.C. 2919.22, this indicates a legislative intent to require proof of serious physical harm everytime someone is charged with endangering children pursuant to R.C. 2919.22(B)(1). We reject this argument noting the well-established principle of statutory construction that a specific statute, in this case R.C. 2919.22(B)(1), (E)(2)(a) and (d), prevails over a general statute, in this case, the blanket reference to R.C. 2919.22 in R.C. 2151.03. See, generally, State v. *Page 15 Taylor, 113 Ohio St.3d 297, 2007-Ohio-1950. Accordingly, appellants' arguments pertaining to Counts 9, 10, 11, 12 and 14 are without merit.
 {¶ 49} Appellants next contend that the evidence was insufficient to convict them of felony child endangering with regards to M.L. in Count 17 of their indictments. Specifically, appellants contend that the testimony of expert, Dr. William Benninger, pertaining to M.L.'s mental health and development, did not rise to the level of certainty required by the law for expert testimony.
 {¶ 50} In support, appellants cite State v. Holt (1969),17 Ohio St.2d 81, which holds that an expert opinion is competent only if it is held to a reasonable degree of scientific certainty. However, an expert is not required to recite any particular words. Instead, the testimony, when considered in its entirety, must be equivalent to an expression of probability. Frye v. Weber Sons Service Repair, Inc. (1998),125 Ohio App.3d 507.
 {¶ 51} R.C. 2912.22(B)(4) provides:
 {¶ 52} "No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:
 {¶ 53} "* * *
 {¶ 54} "Repeatedly administer unwarranted disciplinary measures to the child, when there is a substantial risk that such conduct, if continued, will seriously impair or retard the child's mental health or development;" *Page 16 
 {¶ 55} Dr. Benninger testified that he has been a psychologist for approximately 20 years. He mainly treats children and adolescents. In 2006, he performed a psychological evaluation of M.L. The evaluation involved face-to-face interviews with M.L. as well as the administration of several tests measuring his IQ and psychological development. Benninger testified that M.L. told him that while living with appellants, he had to sleep in a caged bed. Because he had a bed wetting problem, he was sometimes forced to sleep in a bathtub. When asked by the prosecutor for his "opinion to a reasonable degree of scientific or psychological certainty" whether being forced to sleep in a caged bed or a bathtub for approximately three years would "seriously impair or retard [M.L.'s] mental health or development," Dr. Benninger replied: "it would seriously affect his mental health." We find Dr. Benninger's clear, unequivocal answer to be sufficient proof that appellants' conduct presented a substantial risk to M.L.'s mental health and development.
 {¶ 56} Appellants next contend that the evidence was insufficient to convict them of felony child endangering with regards to S.A. in Count 18 of their indictments. Once again, appellants fault the testimony of Dr. Benninger pertaining to S.A.'s mental health and development, arguing that it did not rise to the level of certainty required by the law for expert testimony.
 {¶ 57} Dr. Benninger testified that he also performed a psychological evaluation of S.A., approximately nine years of age. In 2005, Benninger diagnosed him with attention deficit hyperactivity disorder, oppositional defiant disorder and adjustment disorder. Dr. *Page 17 
Benninger testified that S.A. told him that when he lived with appellants, he did not like sleeping in the caged beds appellants had made. When asked by the prosecutor for his "opinion to a reasonable degree of scientific or psychological certainty" whether being forced to sleep in a caged bed for approximately three years "would seriously impair or retard [S.A.'s] mental health or development," Dr. Benninger replied that it was likely to seriously affect the victim's mental health.
 {¶ 58} The Ohio Supreme Court has addressed the issue of expert testimony, concluding that something described as "likely" may nevertheless possess the requisite degree of probability. State v.Benner (1988), 40 Ohio St.3d 301, 313, certiorari denied (1990),494 U.S. 1090, 110 S.Ct. 1834. Viewing Benninger's testimony in its entirety, we believe Benninger clearly indicated to a reasonable degree of scientific or psychological certainty that appellants' conduct presented a substantial risk to S.A's mental health and development.
 {¶ 59} With regard to S.E., the victim referenced in Counts 19 and 6 of their indictments, appellants contend that the evidence was insufficient, again citing Dr. Benninger's testimony, to convict them of felony child endangering and misdemeanor child endangering pursuant to R.C. 2912.22(A). R.C. 2912.22(A) provides:
 {¶ 60} "No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial *Page 18 
risk to the health or safety of the child, by violating a duty of care, protection, or support."
 {¶ 61} Dr. Benninger testified that he performed a psychological evaluation of S.E. In 2005, Benninger diagnosed her with attention deficit hyperactivity disorder and oppositional defiant disorder. S.E. told Benninger that when she lived with appellants, she disliked the big square wooden beds "with wires" on them. She also told Dr. Benninger that appellant Michael had once pushed her face in the toilet and flushed it as punishment. When asked by the prosecutor for his "opinion to a reasonable degree of scientific or psychological certainty" whether being forced to sleep in a caged bed for approximately three years and being subjected to sporadic punishments would "seriously impair or retard [S.E.'s] mental health or development," Dr. Benninger replied: "it could seriously impair her emotional development."
 {¶ 62} While Dr. Benninger's use of the word "could" somewhat weakens his opinion when compared to his definitive opinion that appellants' conduct "would" seriously impair or retard the mental health of M.L, we note that the statute merely calls for a showing of a substantial risk to the health of the child. We find that Benninger's testimony was sufficient to show that there was substantial risk that appellants' actions could impair S.E's health.
 {¶ 63} Finally, appellants contend that the evidence was insufficient to convict them of felony child endangering and misdemeanor child endangering with regards to J.O, referenced in Counts 20 and 1. *Page 19 
 {¶ 64} J.O, approximately eight years of age, was psychologically evaluated by psychologist Dr. Keith Hughes in 2005. He testified that he specializes in treating children and adolescents who suffer from developmental disabilities, mental retardation and autism. Dr. Hughes testified that he interviewed J.O. and administered cognitive development tests on her. In addition, he reviewed her academic records and gathered information from her caretakers. Dr. Hughes diagnosed J.O. as being moderately mentally retarded and testified that she has trisomy 21, a chromosomal disorder more commonly known as Down syndrome. Dr Hughes testified that to a reasonable degree of psychological certainty that the actions of appellants towards J.O, such as confining her to a caged bed at night and shoving a sock in her mouth to keep her from talking, would threaten her development and mental health.
 {¶ 65} In sum, the state's witnesses, if believed, presented sufficient evidence to support the contention that appellants' actions toward the victims posed a substantial risk of impairing or retarding the victims' mental health or development. Moreover, the state's evidence, if believed, was sufficient to establish beyond a reasonable doubt that appellants were guilty of child endangering. Appellants' third and fifth assignments of error are found not well-taken.
 {¶ 66} In their fourth assignment of error, appellants contend that the court erred in denying their motion for a mistrial based on prosecutorial misconduct. Appellants contend that the prosecutor misstated the evidence during his closing argument. *Page 20 
 {¶ 67} The grant or denial of a mistrial rests in the sound discretion of the trial court. State v. Garner (1995), 74 Ohio St.3d 49, 59. In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. See Blakemore, supra.
 {¶ 68} In analyzing claims of prosecutorial misconduct, the test is "whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." State v. Jones,90 Ohio St.3d 403, 420. "The touchstone of analysis `is the fairness of the trial, not the culpability of the prosecutor.'" Id., quoting Smith v.Phillips (1982), 455 U.S. 209, 219. In reviewing allegations of prosecutorial misconduct, the alleged wrongful conduct is reviewed in the context of the entire trial. See Darden v. Wainwright (1986),477 U.S. 168, 179-183. Isolated comments are not to be taken out of context and "given their most damaging meaning." State v. Hill (1996), 75 Ohio St .3d 195, 204.
 {¶ 69} Ultimately, the prosecuting attorney's trial conduct can only be made a ground for error on appeal if the conduct deprives the defendant of a fair trial. State v. Apanovitch (1987), 33 Ohio St.3d 19,24. Where it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. State v. Stallings (2000), 89 Ohio St.3d 280, 286. In addition, it is presumed that a jury followed the court's instructions when deliberating in a case. See, e.g., State v. Ahmed,103 Ohio St.3d 27, 2004-Ohio-4190, ¶ 147. *Page 21 
 {¶ 70} Generally, prosecutors are entitled to considerable latitude in opening statement and closing arguments. State v. Ballew (1996),76 Ohio St.3d 244, 255. In closing argument, a prosecutor may comment freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom." State v. Richey (1992), 64 Ohio St.3d 353, 362, abrogated on other grounds, State v. McGuire (1997), 80 Ohio St.3d 390, 402-403. In addition, since isolated instances of prosecutorial misconduct are generally harmless, any alleged misconduct in the closing argument must be viewed within the context of the entire trial to determine if any prejudice has occurred. See Ballew, supra; State v. Lorraine (1993),66 Ohio St.3d 414, 420. To determine if the alleged misconduct resulted in prejudice, an appellate court should consider the following factors: "(1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." State v.Braxton (1995), 102 Ohio App.3d 28, 41.
 {¶ 71} Appellants contend that the prosecutor misstated many facts during his closing argument such as: (1) the enclosure alarms "went off between 110 and 150 decibels," (2) the children were all hurt and in pain, (3) the children were told by appellants that they were taken in by appellants because no one else would take them in, (4) the children were hit by a board in the barn, (5) the children would spend night and day in the cages, (6) appellants considered M.L. "a monster," (7) the children were hosed down, (8) the enclosures were not properly ventilated; and (9) Lieutenant Sommers found a dresser in front of a child's bedroom door. *Page 22 
 {¶ 72} Appellants are correct that there was no scientific evidence introduced regarding the exact volume of the alarms. However, the children testified that they were loud enough for appellants to hear them from downstairs. There was testimony that some of the children teased the other children by telling them that no one else would take them in. There was testimony by some of the children and others that the children were paddled with a wooden board as punishment. There was testimony that some of the children were hosed down with a garden hose and that the upstairs of appellants' house where the enclosures were kept lacked fans and air conditioning. Finally, there was testimony that two of the children were restrained in their room by the placement of a large chest of drawers.
 {¶ 73} This court has thoroughly reviewed the record of proceedings in the trial court and, upon consideration of the prosecutor's remarks in the context of the entire record, we find that the statements did not amount to prosecutorial misconduct sufficient to warrant the granting of a motion for a mistrial. Accordingly, we find that the trial court's decision to deny the motion for a mistrial was not unreasonable, arbitrary or unconscionable and appellants' fourth assignment of error is not well-taken.
 {¶ 74} In their sixth and final assignment of error, appellants contend that their convictions were against the manifest weight of the evidence.
 {¶ 75} Under a manifest weight standard, an appellate court sits as the "thirteenth juror" and may disagree with the factfinder's resolution of the conflicting testimony. State v. Thompkins (1997),78 Ohio St.3d 380, 387. The appellate court, "`reviewing the *Page 23 
entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id., quoting State v. Martin
(1983), 20 Ohio App.3d 172.
 {¶ 76} Appellants contend that the verdicts were against the manifest weight of the evidence because the verdicts were inconsistent in that some of the convictions were for child endangering and some were for child abuse. We agree with the reasoning of the Eighth District Court of Appeals which stated:
 {¶ 77} "[Inconsistent verdicts on different counts of a multi-count indictment do not justify overturning a verdict of guilt. * * * [J]uries can reach inconsistent verdicts for any number of reasons, including mistake, compromise, and leniency. * * * [I]t would be incongruous for a defendant to accept the benefits of an inconsistent verdict without also being required to accept the burden of such verdicts." State v.Taylor, Cuyahoga App. No. 89629, 2008-Ohio-1626.
 {¶ 78} Appellants have also essentially reasserted the same arguments they presented in their first five assignments of error. Having already determined that these assignments of error are without merit, appellants' sixth assignment of error is found not well-taken.
 {¶ 79} The judgment of the Huron County Court of Common Pleas is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App. R. 24. Judgment *Page 24 
for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Huron County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4.
Mark L. Pietrykowski, J., Arlene Singer, J., Thomas J. Osowik, J. CONCUR. *Page 1