[Cite as *State v. Williams*, 2015-Ohio-405.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                           Court of Appeals No. L-12-1238

    Appellee                                        Trial Court No. CR0201102568

v.

Samuel Todd Williams                           **DECISION AND JUDGMENT**

    Appellant                                       Decided:  January 30, 2015

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

George J. Conklin, for appellant.

* * * * *

**SINGER, J.**

{¶ 1} Appellant, Samuel Todd Williams, appeals the judgment entered in the

Lucas County Court of Common Pleas after a jury found him guilty of two counts of

aggravated murder with death-penalty specifications, two counts of kidnapping and one

count of aggravated burglary.  During the penalty-phase of the capital case, the jury

deadlocked and was unable to reach a unanimous verdict. After consideration, the trial court sentenced appellant to two consecutive terms of life in prison without the possibility of parole for the aggravated murder charges, ten year terms of imprisonment for each of the kidnapping charges and a ten year term of imprisonment for the aggravated burglary charge. The ten year terms of imprisonment were ordered to be served consecutive to each other but concurrent with the consecutive life sentences. For the reasons explained below, we affirm the judgment of the trial court.

{¶ 2} Appellant sets forth ten assignments of error:

Assignment of error number one: The appellant's convictions were not supported by a sufficiency of evidence.

Assignment of error number two: Appellant's convictions are against the manifest weight of the evidence.

Assignment of error number three: The trial court erred in failing to grant appellant's Rule 29 motion to dismiss at the time of trial.

Assignment of error number four: The trial court erred by failing to grant appellant's motion for change of venue, thereby denying his due process and equal protection rights afforded to him pursuant to the United States Constitution and the Ohio Constitution.

Assignment of error number five: The trial court erred in failing to grant defendant's objection to exclude photographs of the deceased and thereby violated his constitutional rights to due process, a fair trial, the right

2.

to confront evidence and the right to be free from arbitrary, cruel and unusual punishment in contradiction to U.S. Constitution, Amendments V, VI, VII, IX and XIV and the privileges granted in the Ohio Constitution.

Assignment of error number six: The trial court erred in denying the appellant's motion to suppress search of his person, in violation of the appellant's constitutional rights as guaranteed by the Fourth and Fourteenth Amendments.

Assignment of error number seven: The appellant was denied effective assistance of counsel, further denying him the right to due process, equal protection under the law and the right to a fair trial as guaranteed by the U.S. Constitution and the Fifth Amendment, Sixth Amendment, Eighth Amendment, Ninth Amendment and the Fourteen Amendment and those guaranteed under the Ohio Constitution.

Assignment of error number eight: The court erred in allowing the jury to have a portion of the transcript of a witness re-read to them, thereby placing undue emphasis on the testimony and denying appellant a fair trial.

Assignment of error number nine: The cumulative effective of the errors committed by the trial court violated the appellant's right to a fair trial and his constitutional rights to due process, the right to confront evidence and the right to be free from arbitrary, cruel and unusual

punishment in contradiction to U.S. Constitution, Amendments V, VI, VII, IX and XIV and the privileges granted in the Ohio Constitution.

Assignment of error number ten: The trial court erred to the prejudice of Mr. Williams when it ordered him to pay unspecified costs, including fees, without first determining the ability to pay those costs.

## I. Factual Background

{¶ 3} The charges against appellant arise out of the strangulation deaths of 20-year-old Lisa Straub and her 21-year-old boyfriend, Johnny Clarke. In the early morning hours of Sunday, January 31, 2011, Lisa and Johnny were found dead at Lisa's parents' house in Holland, Ohio. The victims' hands were bound behind their backs with duct tape and plastic shopping bags covered their heads.

{¶ 4} Following an investigation, the Lucas County Grand Jury issued a five-count indictment against appellant on September 30, 2011. Counts 1 and 2 each charged appellant with aggravated murder, in violation of R.C. 2903.01(B) and (F). Counts 1 and 2 included identical death penalty specifications, to wit: (1) the offense was part of a course of conduct involving the purposeful killing or an attempt to kill two or more persons by the offender as set forth in R.C. 2929.04(A)(5), and (2) the offense was committed while the offender was committing, or attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder, or if not the principal offender, committed the aggravated murder

with prior calculation and design as set forth in R.C. 2929.04(A)(7). Count 3 charged appellant with aggravated burglary, in violation of R.C. 2911.11(A)(1), and Counts 4 and 5 charged appellant with kidnapping, in violation of R.C. 2905.01(A)(3) and (C).

{¶ 5} Appellant was arrested on September 22, 2011, and pled not guilty to the charges. Subsequently, Cameo Pettaway, appellant's alleged accomplice, was indicted and arrested. Appellant and Pettaway were tried separately.

{¶ 6} Appellant's jury trial began on July 17, 2012. The state premised its case against appellant on circumstantial evidence under the theory of accomplice liability. The following testimony and evidence was adduced at trial.

{¶ 7} Lucas County Sheriff Deputy Frank Reidy testified that during the early morning hours of January 31, 2011, he "received a call of two people inside [the Straub home] that were bound and had bags over their heads." He was the first officer to arrive on the scene. He observed damage to the front doorway of the home. Inside the home, he saw a man and a woman lying face up in the kitchen, in opposite directions of each other. There were bags on both of the individuals' heads, which had been ripped open exposing their faces. There was what appeared to be black tape around both individuals' necks and both individuals' arms were behind their backs. The man's ankles appeared to be taped with black tape. The woman's legs were not bound.

{¶ 8} Deputy Reidy also found the second floor of the home was "ransacked," but the first floor was relatively clean although he did observe some signs of struggle: a living room planter was knocked over, a clock was knocked off of the wall, and some

5.

broken cell phones were on the floor. In addition, some of the kitchen cupboards and drawers were opened up and some knives were laying out on the kitchen countertop.

{¶ 9} Sergeant Christopher Curley, a shift commander for the Lucas County Sheriff's Office, testified one bedroom of the Straub home appeared to have been ransacked, some drywall was broken and things were knocked around like there had been a struggle or somebody tore the place up. On his way out to the garage, Sergeant Curley noticed a cigarette butt in the hall by the door to the garage.

{¶ 10} Ed Beiderstedt, a special agent supervisor with the Ohio Attorney General, Bureau of Criminal Investigation ("BCI"), assisted in processing the crime scene, including taking pictures and collecting evidence. He testified the door to Lisa's room showed signs of "inward impact" damage. He also indicated he found six white envelopes containing Iraqi currency in the Straubs' master bedroom closet.

{¶ 11} Dr. Maneesh Pandey, a deputy coroner and forensic pathologist with the Lucas County Coroner's office, performed the autopsies of Lisa Straub and Johnny Straub. He described their injuries and the manner in which they were bound. Dr. Pandey stated Lisa's toxicology report showed she had therapeutic levels of Vicodin and Percocet in her system, while Johnny's toxicology report showed he had minute levels of Percocet in his system and the presence of marijuana in his urine. Dr. Pandey opined the cause of death for both Lisa and Johnny was asphyxiation due to strangulation and suffocation. The doctor was not able to determine which victim died first or a specific time of death.

6.

{¶ 12} Staci Violi, a BCI expert in the area of forensic DNA analysis, performed DNA testing on several items found at the crime scene. DNA samples collected at the crime scene were compared to DNA standards for 36 suspects, including appellant and Cameo Pettaway. DNA profiles developed from samples taken from the scene were consistent with both Johnny and Lisa. Some samples produced no reliable DNA evidence while some samples produced partial profiles which were not suitable for comparison purposes. A swab from the inside of Johnny's sweatshirt pocket indicated DNA contributions from an "unknown female number one," and an unknown individual. A swab from the inside of the Johnny's sweatpants pockets indicated DNA contributions from "unknown female number one."

{¶ 13} Cassandra Agosti, an expert in the field of forensic DNA analysis, compared numerous DNA samples collected at the crime scene to DNA standards for 53 individuals, including appellant and Cameo Pettaway. She testified a swab from the duct tape around Johnny's ankles indicated DNA contributions from "unknown female number one" and a swab from the duct tape around Johnny's wrists indicated DNA contributions from at least two unknown individuals, one of them male. A DNA profile developed from hairs found on Johnny's sweatpants indicated DNA contributions from "unknown female number two" and "unknown female number three." The DNA profile from the cigarette butt found in the Straub home was a mixture consistent with contributions from appellant and Cameo Pettaway.

7.

{¶ 14} Prior to law enforcement finding the victims' bodies, three 9-1-1 calls were made in the early morning hours of January 31, 2011, by Johnny Clarke's mother, Maytee Vasquez Clarke. At 1:21 a.m., Mrs. Clarke placed the first call and informed the operator she had just gotten a call from her son's friend and she feared for her son's safety. Mrs. Clarke reported her son's friend had driven past the Straub home and "all the lights are on and the cabinets look ransacked." Mrs. Clarke placed a second call at 2:06 a.m., stating she was a "concerned mother," who wanted to know where her son was, and she had a feeling that Tiffany, her son's friend, "set up her son." In the last call, placed at 3:50 a.m., Johnny's mother said, "you need to get the police out to [the Straub home]. * * * [My son] and his girlfriend are tied up in the basement * * * they are unconscious * * *."

{¶ 15} Lucas County Deputy Sheriff Daniel Knorek responded to the Straub home three times on January 31, 2011. The first call came in at approximately 1:25 a.m. "to check the safety of the residents, that there may be some individuals inside that might be in jeopardy." He looked in the front door's sidelights and saw no signs of a struggle. In the back of the house, the television and some lights were on, but there were no signs of distress, forced entry or suspicious footprints in the snow. Just before the deputy left the home, he saw a "suspicious vehicle."

{¶ 16} Deputy Knorek received the second call at 2:07 a.m. and the "suspicious vehicle" was parked in the driveway of the Straubs' home. He did not speak with the occupants of the vehicle, but did speak with Johnny's mother who wanted him to force

8.

open the door to the home.  The detective checked the property again and nothing appeared different than it had when he was there the first time, so he left.

{¶ 17} Deputy Knorek received the third call at 3:50 a.m. after "family members forced entry into the house and discovered two bodies in the home."  He arrived at the house, put crime scene tape up, told everyone to get back, then checked and cleared the house.

{¶ 18} Lisa's parents, Jeff and Mary Beth Straub, who had left town for an extended vacation on Thursday, January 27, 2011, were notified of the victims' deaths.  Only Lisa, Johnny and their puppy were supposed to be at the house during Mr. and Mrs. Straub's absence.  Mrs. Straub testified Lisa started dating Johnny in the summer of 2009, shortly after Lisa graduated from high school.  Lisa had moved in and out of the Straub home several times between the summer of 2010 and late November 2010, when Lisa moved back into the Straub home for the final time.  In December 2010, Mr. and Mrs. Straub allowed Johnny to also move into their home.  Prior to her death, Lisa had been a part-time waitress at TGI Fridays on Airport Highway and was taking college classes.

{¶ 19} Mr. and Mrs. Straub both testified no smoking was allowed in their house.  Mr. Straub testified he did not keep a safe in the home, nor did he keep large amounts of U.S. currency or expensive jewelry.  He did, however, keep some Iraqi currency underneath his chest of drawers in the master bedroom closet.  He had paid $4,500 USD

9.

for 4.6 million Iraqi dinar. He denied owning or keeping black duct tape in the home. Mr. Straub did not know appellant or Cameo Pettaway.

{¶ 20} Numerous friends and acquaintances of Johnny Clarke testified at trial about Johnny as well as some of the events preceding his and his girlfriend's deaths. Many people who knew Johnny said he liked to brag, he used Percocet and marijuana, and he sold weed. Some of Johnny's friends knew about the rules at the Straubs' house, including smoking was not allowed in the home, while other friends had heard certain things about the Straubs' house, for instance, that Lisa's parents had a safe at the house and had a lot of money. In addition, several witnesses testified Johnny and Aaron Griffin, otherwise known as AP, would argue and had "an issue" over a girl, specifically Alexandra Cousino ("Alex"). Johnny and Alex also had some past problems.

{¶ 21} Zachary Burkett ("Zack") testified late on the morning of January 30, 2011, he was picked up at his house on Airport Highway near Westwood by Alex. Zack indicated he met Alex through AP and had not known her very long, but knew she sold drugs, like heroin and pills. The two drove to Alex's grandparents' house to find some Percocet, then went to eat at IHOP on Airport Highway. Zack testified while at IHOP, he received a phone call from Johnny who had just woken up and was looking for some pills because Johnny was "pill sick." Johnny called Zack's phone "back to back to back" but Zack did not answer these calls. Alex also testified Zack did not answer the phone while she was with him and Zack "was kind of aggravated and very irritated because Johnny was incessantly calling his phone back and forth, back and forth."

10.

{¶ 22} After eating, Alex dropped Zack off at his house. Alex testified she was then with her boyfriend, Deshawn Belcher, "and we were basically driving around smoking weed * * * [m]ostly [on] the East Side." From 3:22 p.m. until 5:25 p.m. on January 30, 2011, Johnny made 28 unanswered phone calls to Zack. Zack spoke with Johnny at 6:05 p.m. at which time Zack said he made plans to hang out with Johnny, Lisa and Tiffany Williams, just as they had done three nights earlier, the night Lisa's parents had left town. Zack stated he had only been to the Straub home on that one occasion.

{¶ 23} Late in the afternoon on January 30, 2011, Ruben Ruiz received a call from Johnny. Ruben thought Johnny wanted to hang out, but Ruben did not. Ruben had known Johnny for about five years, and at one time he and Johnny were "best friends" but the relationship changed when Johnny started taking Percocets.

{¶ 24} Tiffany Williams testified that earlier in the day of January 30, 2011, she was at AP's house. At the time of the events in question, Tiffany was dating and was pregnant by AP. She acknowledged AP had "an issue" with Johnny because "Johnny Clarke and Alexandra Cousino had had sex, and Alex was AP's ex-girlfriend." Tiffany indicated she met Johnny in the summer of 2010 through Zack, then met Lisa a few months later.

{¶ 25} When Tiffany was ready to leave AP's house later in the afternoon of January 30, 2011, she called Johnny and asked him to give her a ride over to Zack's house. Johnny refused so she called someone else. Tiffany was at Zack's house when they made plans to get together with Johnny and Lisa later that night. "We planned on

11.

getting some pills and going over and shooting some pool." Tiffany said the plan was that after Lisa got off of work, Johnny and Lisa were going to drive over and pick up Tiffany and Zack at Zack's house and drive back to Lisa's parents' house. Tiffany had previously been to the Straub home on one occasion, the evening of Thursday, January 27, 2011.

{¶ 26} Tiffany had a conversation with Lisa about "holding" some Percocets until Tiffany could get the money to cover it. Lisa asked Johnny, who said he could not do it. Tiffany then texted Lisa "that I always look out for them if they needed it, and if he was going to act funny then I was going to tell on him for cheating on her with one of my friends."

{¶ 27} Johnny's friend, Michael Dominguez, testified at about 7:30 on the evening of January 30, 2011, Johnny came over to watch football. Johnny left Michael's house around 9:00 or 9:30 to pick Lisa up from work. Michael never talked to Johnny again.

{¶ 28} Matthew Yockey testified on January 30, 2011, he went to AP's house at 9:00 or 10:00 p.m. Around that time, Matthew received a phone call from Zack who was looking for Percocet for his "dude," who Matthew later found out was Johnny. Matthew had gone to high school with Johnny, but only became acquainted with Johnny when they were introduced by AP. Matthew said he did not give Zack any pills. Zack called Matthew later that night and said something happened to his "dude." Matthew said he was with AP until he, Matthew, left AP's house at 3:00 or 4:00 in the morning on January 31, 2011. Matthew also testified AP was in prison at the time of appellant's trial.

12.

{¶ 29} At 10:41 p.m. on January 30, 2011, Tiffany called Johnny. When Johnny answered his cell phone, he did not say "hello." Instead, Tiffany said she heard a male voice in the background and heard Johnny exclaim several times, "Who the fuck are you and what the hell are you doing?" She then heard Johnny say, "I'll call you back, Tiff." Tiffany said Johnny was yelling and his tone of voice was "[l]ike excited, like confused. But like excited like not a normal - not a normal tone at all. Like high pitched." Tiffany and Zack tried to contact Johnny and Lisa numerous times, but their phone calls and text messages went unanswered.

{¶ 30} Tiffany said she was concerned about what she had heard, but she did not call the police because she knew Johnny and Lisa had drugs in the house. Tiffany ran several errands, including getting money and Percocet, then she argued with Zack about whether they should go to the Straub home. Although it was cold and snowy, Tiffany convinced Zack they should drive out, and they arrived at the Straub house at about 12:30 a.m. on January 31, 2011.

{¶ 31} Tiffany knocked on the Straubs' front door and rang the doorbell, but no one answered. She looked in the front door's sidelights and said it was unusual that the upstairs interior doors were open and the house's interior lights were on because the "rules of the house" required inhabitants and guests to "shut the doors behind you and shut the lights off." Tiffany and Zack then left the Straub home.

{¶ 32} Tiffany called Sherrita Crumby, who had been Ruben's girlfriend. Tiffany told Sherrita, "[w]hat I heard, that I called and Johnny picked up, and he hung up quickly,

13.

and I heard people there, and nobody was supposed to be there." Sherrita testified she received a telephone call from Tiffany a few minutes past one on the morning on January 31, 2011, and Tiffany was "all out of breath." After hanging up with Tiffany, Sherrita called Johnny's mother.

{¶ 33} Ruben testified he received a phone call from Zack just after 1:00 a.m. on January 31, 2011, which Ruben found unusual since he and Zack were not friends because Zack "was real into drugs." Ruben testified Zack wanted to pick Ruben up and go out to the Straub home because Lisa and Johnny were not answering their phones and Zack thought something was wrong. Ruben declined to go with Zack.

{¶ 34} Tiffany then received a phone call from Johnny's father, John P. Clarke, who insisted Tiffany and Zack pick him up and they all drive to the Straub home. Tiffany and Zack picked up Mr. Clarke and the trio reached the Straub home just after 1:00 a.m. Instead of pulling into the Straubs' driveway, Tiffany turned and drove off because numerous police and sheriff cars were there. Trial testimony reveals one or more of the trio had warrants.

{¶ 35} After the police had left, Tiffany, Zack and Mr. Clarke returned to the Straub home. They knocked on the door, but no one answered. They walked around the outside of the residence and tried to look in the windows, but the shades were closed and they could see very little. Johnny's mother and her cousin then arrived at the Straub home. Mrs. Clarke called 9-1-1. Officers responded, took contact information from Tiffany and Zack, and eventually allowed them to leave.

14.

**{¶ 36}** Mr. Clarke, Mrs. Clarke and her cousin also left the Straub home and drove around, all the while calling Johnny's phone and calling Johnny's friends. No one had heard from Johnny.

**{¶ 37}** Sometime after 3:30 a.m., Mr. Clarke, Mrs. Clarke and her cousin drove back to the Straub home for a closer look at the interior of the home. Ultimately 9-1-1 was called and Mr. Clarke kicked in the front door, entered the house and found Johnny and Lisa with plastic bags over their heads, dead.

**{¶ 38}** Tanisha Madyun, the mother of Cameo Pettaway's baby, testified Cameo and appellant are good friends and appellant stayed with her and Cameo three nights or so at the end of January 2011. She acknowledged Cameo and appellant smoked Newport cigarettes and it was not uncommon for the two friends to share a cigarette when they were together.

**{¶ 39}** In the early morning hours of February 1, 2011, Alex sent a text message to a girl she was "having problems with." The message said,

> You do not know shit about me, fam. So fall back 'cause I promise you I ain't no bitch. I do this shit, fam. Watch the news, bitch. Mother-fuckers get duct taped and tied up and left for dead. So what you trying to do, fam. You saw me looking at you at the store. You should have asked me, and I would have told you who I am period.

**{¶ 40}** By way of background, Alex testified she was friends with Johnny, Lisa, Zack, Tiffany, AP, appellant and Cameo Pettaway. She had been friends with appellant

15.

since she was 13 years old and considers him a brother. She met appellant through her children's father, Nate Popovich. Nate was involved in a relationship with appellant's former wife, and Nate and appellant's former wife have children together. Alex stated that prior to their arrests, she hung out "a lot, very often" with appellant and Cameo.

{¶ 41} Regarding the problems between Johnny and Alex, two incidents occurred, one involving a dog and the other involving a car.

{¶ 42} With respect to the dog incident, Alex testified in September and October 2010, she lived in a motel and had a pit bull puppy. Zack recalled Johnny and Lisa visited Alex at the hotel room in October of 2010 and saw that Alex was not taking care of the puppy. Johnny and Lisa offered to buy the puppy; Alex wanted $100. Lisa and Johnny paid Alex $50 and took the puppy, but never paid the other $50. This upset Alex. Alex testified they eventually made up and she started hanging out again with Johnny and Lisa.

{¶ 43} As to the car incident, around Thanksgiving 2010, Johnny offered to sell his car to Alex. Alex testified she was hanging out with Johnny and Zack at Zack's house and Johnny was high. The trio went to IHOP on Airport Highway and "the whole drive there he [Johnny] was bugging me about it and kept bringing it up and basically was begging me to buy the car because he had really needed the money." Alex finally agreed to buy the car for $1,500, she gave Johnny $750 in cash and "would give him the other half when we got the title notarized." Zack remembered Johnny "was really hurting on money" and sold his car to Alex for about $1,200 or $1,300. Later that day, Alex

16.

dropped Johnny off at his mother's house. Alex then received an angry phone call from Johnny's mother who was "screaming, cussing, saying that I drugged her son which I didn't. Basically that I tricked him into selling me the car. But Johnny was in the background the whole time telling her * * * it was his idea." The title work for the car was never transferred and Alex never paid Johnny the balance due for the car. After a few weeks, the car broke down and Alex had the car towed back to her house in east Toledo. Alex testified "[Johnny] was upset because he wanted his money for the car and I broke the car, now he's out of a car. And I was upset because I paid him money for a car that had broke down." Alex and Johnny argued over the phone and Alex said Johnny "threatened me with his dad and threatened, he said he was going to call the police on me if I didn't give him his car back." During the call, Alex threatened to beat up Lisa. Alex testified Johnny's dad retrieved the car and she never saw Johnny again. Zack said Alex was mad because "[s]he took a $650 dollar loss or $700 loss." Mr. Clarke was also aware Alex made threats to Johnny over the car.

{¶ 44} Eric Yingling testified at trial that in December 2011, he was being held in the Lucas County jail after he pled, was sentenced and was sent to prison for nonsupport, a fifth degree felony. Also at that time, appellant was being held in the jail on the same floor. Yingling made contact with appellant and a relationship developed. Yingling stated since he had already been sentenced, other inmates tended to trust that he would not attempt to make a deal with police in exchange for testimony. Yingling admitted he had several other convictions and he had provided information in other cases.

**{¶ 45}** Yingling described what appellant told him happened to Johnny and Lisa:

He did tell me that they went in through the garage, and that he was kind of unclear how either Eric [Taylor] or Cameo - I never did get which one knew Johnny Clarke - but he did tell me that when they went in the garage there was an entrance door to the home.

And when they knocked and opened it that Johnny Clarke was on the phone. And when he saw who was there, he said something, this is not a quote but something to the effect of, hey, what are you doing here, who are these people?

\* \* \*

He said that he went into the house, and they started yelling, getting violent with it. And Johnny Clarke told Lisa to go upstairs, did not say if it was a bedroom or what, just to go upstairs. And they started yelling and screaming about where's the diesel, where's the money, and they're telling them there's nothing there, there's nothing there.

One story that Sam says, they ransacked the house. The next story it doesn't. Throughout the time I was with him, little things changed. And when they did, they always slanted to his benefit.

But he went on to tell me that they were in there searching for the stuff and couldn't find anything. Lisa had gone upstairs and went into a locked room. I don't know what type of room. But Sam had to push

18.

through that locked door to get in there and bring her out and bring her downstairs. * * * When they brought Lisa downstairs, and they finally got tired of begging them to tell them where the stuff was, yelling, threatening them, they were going to pistol whip them, but they were worried about DNA.

So they set them in chairs facing each other, wherever they took the bags, and Johnny did not get a bag over his head first, according to the story. It was Lisa. They were trying to torture Lisa, for lack of better words, to motivate Johnny to tell them, hey, here's where the money is, here's where the drugs are.

And it never happened. On the third time that Lisa passed out, she never woke up. And that's why they went, Sam and Cameo at that point went to the garage.

These kids were apparently still on the upper level of the house, not in the basement, and they were out there smoking a cigarette, talking about what they were going to do.

Sam had told me that he had thought, him and Cameo had talked about maybe killing Eric Taylor. The cigarette that was found with the DNA, they are sharing it in the garage at time trying to discuss.

While they were in the garage, Eric Taylor was inside killing Johnny Clarke.

{¶ 46} Yingling recalled appellant saying, "how he will never forget the way that that bag made a crinkling sound going inside the mouth and outside the mouth as young Lisa Straub breathed. That's one thing that was repeated a million times * * *."

{¶ 47} Yingling further said, "Cam Pettaway, by Sam's word, is the one who had killed Lisa Straub, and they did not go there to kill anybody."

{¶ 48} Yingling indicated appellant revealed they had found some sort of foreign money in the Straub home, "it was Ghadaffi or So-Damned-Insane, is how he [a]ppellant said it, meaning Sadam Hussain." Yingling testified appellant left the money in the house because even if it was real, appellant did not know how to exchange it for U.S. currency.

{¶ 49} The state introduced cell phone and jail call records at trial. Detective William Jay Gast, a Toledo police officer trained in forensic analysis of cellular telephone data, testified he was asked to analyze data related to numerous cell phone numbers including numbers registered to Zack Burkett, Sherrita Crumby, Starla Cowell Williams (appellant's wife), Maytee Clarke, Lisa Straub, Cameo Pettaway, Johnny Clarke, Tiffany Williams and Alexandra Cousino. Detective Gast testified Cameo Pettaway's cell phone did not receive or send any text messages or make or receive any phone calls from 6:35 p.m. on January 30, 2011 until 12:59 a.m. on January 31, 2011. The detective could not determine whether the phone was on or off during that period of time.

20.

{¶ 50} Detective Gast also analyzed data from a cell phone registered to appellant's then-girlfriend, now wife, Starla Cowell Williams. At 5:58 p.m. on January 30, 2011, a 32-second call was made from Cameo Pettaway's phone to Starla's phone, and six unanswered calls were placed from Starla's phone to Cameo Pettaway's phone between 2:38 a.m. and 3:27 a.m. on January 31, 2011.

{¶ 51} Captain John Sylvester, the director of jail security with the Lucas County Sheriff's Office, testified regarding jail phone calls. All inmates booked into the jail are given an identification number ("PIN"), which allows the inmates to make outgoing calls. Captain Sylvester stated all calls are automatically recorded and the records are kept in a locked area. He also has the ability to monitor inmates' calls.

{¶ 52} Captain Sylvester testified, on occasion, an inmate will give his PIN to another inmate to use. When this happens, it is very difficult for law enforcement to track the recorded calls. The captain also discussed three-way calls which occur sometimes. He stated if the number that is initially called, the destination number, makes a three-way call to another number, that other number is not recorded, so "[t]hat would be extremely difficult [to track] * * *."

{¶ 53} Captain Sylvester testified appellant was assigned a PIN and made three calls on September 22, 2011. These recorded calls were played for the jury. Two of the calls were between appellant and Cameo Pettaway. Captain Sylvester also testified regarding a 20 minute, 33-second jail phone call which was made on April 19, 2012. This call was also played for the jury. The recorded phone call was made by appellant to

21.

Steven Pettaway, Cameo Pettaway's brother, although the call record showed the call was not made with the PIN assigned to appellant.

{¶ 54} The defense called Jeff Kozak, a detective with the Lucas County Sheriff's Office, to testify, who became the lead detective on the case. He stated when law enforcement units arrived at the Straub home on January 31, 2011, the alarm system was off; he did not know who turned it off. He testified the key found under Lisa's body was a key to the alarm system control box, which was located in the basement of the Straub home. The detective stated he was familiar with Cameo Pettaway's brother, Steven Pettaway, and in January 2011, Steven Pettaway was incarcerated.

{¶ 55} Detective Kozak indicated information about the dinars, the Iraqi currency found at the Straub home, was not made public, although dinars were listed as property seized from the crime scene pursuant to the search warrant.

{¶ 56} Detective Kozak was questioned about the informant, Eric Yingling, and denied doing anything to help Yingling. The detective did not recall if he or anyone else in the sheriff's department talked to a prosecutor about the case.

## II. Argument

{¶ 57} Following appellant's conviction, he appealed, and set forth ten assignments of error, the first of which is:

> Assignment of error number one: The appellant's convictions were not supported by a sufficiency of evidence.

{¶ 58} "A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law." *State v. Shaw*, 2d Dist. Montgomery No. 21880, 2008-Ohio-1317, ¶ 28, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). During a sufficiency of the evidence review, an appellate court's function is to "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus.

{¶ 59} Here, appellant asserts the record is void of any "scientific or other evidence" that places him at the scene, committing any offense. He points to the lack of eyewitness testimony, the absence of incriminating DNA evidence on the materials used to bind and asphyxiate the victims, and the lack of testimony linking the cigarette butt found on the hallway floor to the commission of any crime.

{¶ 60} The record shows the state presented evidence that DNA found on a cigarette butt collected from the crime scene was consistent with DNA contributions from appellant and his friend, Cameo Pettaway. The cigarette butt was on the hallway floor of

23.

the Straubs' home, which was next to the kitchen where the bodies of the victims were found. Appellant observes Ms. Agosti, from BCI, testified there was no information how or when the cigarette butt was deposited at the Straub home. Appellant appears to suggest the cigarette butt could have been left at the house prior to the events in question. However, Jeff and Mary Beth Straub both testified they did not allow smoking inside their home and both Zachary Burkett and Tiffany Williams indicated even in her parents' absence, Lisa enforced the "rules of the house," which included no smoking in the house.

{¶ 61} As to Eric Yingling's testimony that appellant was at the Straubs' home when the crimes were committed, appellant submits Yingling admitted obtaining knowledge about the events from other sources, and some remarks attributed to appellant were inconsistent with evidence at the crime scene. Appellant, in effect, challenges Yingling's credibility. Appellant cites to three pages of the trial transcript in support of these contentions.

{¶ 62} The record shows Yingling testified at trial that he admitted to police that his wife "did some checking on the internet about this very case." Presumably this is the other source of Yingling's knowledge, to which appellant refers. However, Yingling's testimony included that appellant and his companions found "monopoly money" with pictures of "Ghadaffi or So-Damned-Insane" at the Straub home, and information about the dinars was not publicized according to Detective Kozak. Thus, Yingling's testimony about this aspect of the crime scene is corroborated by the detective's testimony as well

24.

as Jeff Straub's testimony that he kept a large amount of Iraqi currency under the dresser in his bedroom closet.

{¶ 63} Regarding appellant's claim that Yingling attributed some remarks to appellant which were inconsistent with evidence at the crime scene, the page of trial testimony to which appellant refers shows Yingling testified, "One story that Sam says, they ransacked the house. The next story it doesn't." While these statements are inconsistent with each other, they are substantiated by the testimony of law enforcement officers who described the ransacked nature of some portions of the Straub home.

{¶ 64} Appellant further claims "cell phone calls attributable to Samuel Williams on the night of the offense placed the cell phone at least 15 miles from the location of the homicide." The record shows Officer Gast testified on cross-examination that a 32-second call from a cell phone registered to Starla Cowell Williams "hit off" a cell tower at least 15 miles from the Straub home on January 30, 2011 at 10:27 p.m. Appellant asserts this call demonstrates he could not have been in the Straub home at 10:41 p.m. A review of the record, however, reveals there was no evidence introduced at trial that appellant made that call or possessed the cell phone at that time. In fact, no evidence was presented as to who actually made the call or who had the cell phone.

{¶ 65} Our examination of all of the evidence offered at trial, construed in favor of the prosecution, leads us to conclude there was sufficient evidence presented to the jury, which if believed, could convince the average mind of appellant's guilt beyond a reasonable doubt.

25.

## A. Aggravated Burglary

{¶ 66} The jury found appellant guilty of aggravated burglary, in violation of R.C. 2911.11(A)(1), as charged in Count 3 of the indictment. R.C. 2911.11(A)(1) provides "[n]o person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person * * * is present, with purpose to commit in the structure * * * any criminal offense, if * * * [t]he offender inflicts * * * physical harm on another[.]"

{¶ 67} At trial, Tiffany Williams testified she placed a call to Johnny Clarke at 10:41 p.m. on January 30, 2011. When Johnny answered the phone, Tiffany heard Johnny exclaim several times, "Who the fuck are you and what the hell do you want?" In turn, Eric Yingling testified appellant revealed to him how and with what intent he and his accomplices entered the Straub home. Yingling also relayed to the jury that appellant said they did not go to the Straub home to kill anyone, but things "went beyond what they were expecting" when Lisa failed to wake up after they made her pass out in an effort to "motivate Johnny" to tell them where the drugs and money were. Testimony from law enforcement officers describing the "ransacked" nature of the second floor and a portion of the first floor of the Straub home is consistent with Yingling's testimony that appellant and his accomplices entered the Straub home in search of something.

{¶ 68} After viewing the above evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense of aggravated burglary proven beyond a reasonable doubt.

## B. The Kidnapping of Lisa Straub and Johnny Clarke

{¶ 69} The jury found appellant guilty of kidnapping in violation of R.C. 2905.01(A)(3) and (C), as charged in Counts 4 and 5 of the indictment. R.C. 2905.01(A)(3) states "[n]o person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o terrorize, or inflict serious physical harm on the victim or another * * *."

{¶ 70} R.C. 2905.01(C) reduces the first degree felony to a felony of the second degree if the offender releases the victim in a safe place unharmed. On the verdict form, the jury indicated they "d[id] not find that while committing the kidnapping" appellant released Lisa Straub and Johnny Clarke "in a safe place unharmed."

{¶ 71} At trial, the responding officers testified that when they entered the Straub home, Johnny was found dead with his hands and legs restrained with black duct tape. Lisa was found dead with her hands bound behind her back. Eric Yingling testified appellant admitted "they" had placed Lisa and Johnny in chairs, either side by side or facing each other, and "they" yelled and threatened the victims before "they" got the idea to suffocate Lisa with a plastic shopping bag in an effort to "motivate Johnny" to reveal the location of drugs and money.

{¶ 72} Yingling also testified appellant admitted to forcing himself through a locked door on the second story of the home to bring Lisa downstairs. This evidence was corroborated by crime scene photographs depicting damage to Lisa Straub's second story

27.

bedroom door, as well as the testimony of Mr. Beiderstedt, that the door to Lisa's room showed signs of "inward impact" damage.

{¶ 73} After viewing the above evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the kidnapping of Lisa Straub and the kidnapping of Johnny Clarke proven beyond a reasonable doubt.

### C.  Aggravated Murder

{¶ 74} The jury found appellant guilty beyond a reasonable doubt of two counts of aggravated murder in violation of R.C. 2903.01(B) and (F), as charged in Counts 1 and 2 of the indictment.  R.C. 2903.01(B) states:  "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit * * * kidnapping * * * [or] aggravated burglary * * *."  R.C. 2903.01(F) provides:  "[t]he foregoing offense constitutes aggravated murder."

{¶ 75} The jury further found appellant guilty beyond a reasonable doubt of the first specification attendant to Counts 1 and 2.  Specifically, the jury found appellant guilty of "committing the offense of Aggravated Murder that was part of a course of conduct involving the purposeful killing or attempt to kill two or more persons, to wit: Johnny Clarke and Lisa Straub, or was a complicitor with one or more others * * * ."

{¶ 76} In *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus, the Ohio Supreme Court held in order to support a conviction for complicity by aiding and abetting, pursuant to R.C. 2923.03(A)(2), there must be evidence which shows the

28.

defendant "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime," and "shared the criminal intent of the principle." Intent may be inferred from the circumstances of the crime. *Id.*

{¶ 77} Criminal intent may also be inferred from "presence, companionship and conduct before and after the offense is committed." *State v. Robinson*, 6th Dist. Lucas No. L-02-1314, 2005-Ohio-324, ¶ 42, citing *Johnson* at syllabus (other citations omitted). Mere presence of an accused at the crime scene is not, of itself, sufficient to prove the accused was an aider and abettor under R.C. 2923.03(A)(2). *Johnson* at 243. "This rule is to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission." *Id.*

{¶ 78} Here, the evidence presented by the state, if believed, established more than appellant's "mere presence" at the crime scene. Eric Yingling testified appellant repeated "a million times" the fact that he "will never forget the way that that bag made a crinkling sound going inside the mouth and outside the mouth as young Lisa Straub breathed." The state also called Alex Cousino, appellant's very close friend and companion, who testified the last time she spoke with Johnny, about a month before he was killed, they argued, Johnny threatened her and she threatened to beat up Lisa. The state presented a text message sent from Alex less than 24 hours after Johnny and Lisa's bodies were found, which warned: "I do this shit * * * Watch the news, bitch. Mother-fuckers get duct taped and tied up and left for dead."

29.

**{¶ 79}** The evidence showed Johnny and Lisa were found with plastic shopping bags over their heads, secured at their necks with black duct tape. Mr. Straub said he did not own or keep black duct tape at the home. The deputy coroner testified the duct tape was tied "very tightly" around the victims' necks, and on both victims' bodies he observed external neck injuries as well as eye and facial petechiae (spots caused by the breaking of small blood vessels). He explained petechia is "usually seen with any kind of compression to the neck area." Internally, the deputy coroner found hemorrhaging in the victims' neck muscles which he opined was caused by the pressure applied in the area where there was duct tape.

**{¶ 80}** The deputy coroner stated the cause of death for both victims was "asphyxia (seconds to minutes) * * * due to * * * some decrease in oxygen, in this case strangulation and suffocation." The deputy coroner explained "[t]his decrease of the oxygen, the person would lose consciousness. And once you lose consciousness, you will go into coma." Then, "depending on how long or how strong the force is for that decrease in oxygen, the mechanism, * * * if you're not able to remove that, the person is going to eventually die." The deputy coroner further stated "[i]t doesn't happen instantly. But it will happen over a few seconds to minutes depending on how healthy the person is and how much they're able to handle."

**{¶ 81}** A jury could conclude appellant or his companions brought duct tape to the Straub home to restrain the victims, and that appellant supported and, by doing nothing to

30.

prevent asphyxia, cooperated in killing Lisa Straub and Johnny Clarke. *See State v. Butcher*, 11th Dist. Portage No. 2011-P-0012, 2012-Ohio-868, ¶ 68.

{¶ 82} Finally, the state presented evidence to the jury of the recorded phone call appellant made from jail to Steven Pettaway, Cameo Pettaway's brother. Appellant used another inmate's PIN to place the call. During the call appellant stated, "when you was in the joint man, we took off man * * * that was supposed to be me and you, but you know, little bro had to step up and take your spot man." Steven Pettaway responded, "Yea, but you know he ain't gonna, he ain't gonna do it right like I would did it right." Appellant replied, "no he didn't do it right but he did it good enough to make something happen." Steven Pettaway confirmed, "He did it good enough, he did it good enough, you're right." Later, appellant said, "It was crazy though," and, "[t]hey ain't got no black and white on me."

{¶ 83} Based on this evidence, we find any rational trier of fact could have found the essential elements of aggravated murder, or complicity to aggravated murder, of Lisa Straub and Johnny Clarke, proven beyond a reasonable doubt. For the foregoing reasons, appellant's first assignment of error is not well-taken.

Assignment of error number two: Appellant's convictions are against the manifest weight of the evidence.

{¶ 84} The standard of review for manifest weight is the same in a criminal case as in a civil case, and an appellate court's function is to determine whether the greater amount of credible evidence supports the verdict. *Eastley v. Volkman*, 132 Ohio St.3d

31.

328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12; *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "A manifest weight of the evidence challenge contests the believability of the evidence presented." (Citation omitted.) *State v. Wynder*, 11th Dist. Ashtabula No. 2001-A-0063, 2003-Ohio-5978, ¶ 23. When determining whether a conviction is against the manifest weight, the appellate court must review the record, weigh the evidence and all reasonable inferences drawn from it, consider the witnesses' credibility and decide, in resolving any conflicts in the evidence, whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Prescott*, 190 Ohio App.3d 702, 2010-Ohio 6048, 943 N.E.2d 1092, ¶ 48 (6th Dist.), citing *Thompkins* at 387.

{¶ 85} It has long been held that the weight to be given to the evidence and the credibility of the witnesses is primarily for the trier of fact to decide. *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1992). When reviewing a manifest weight of the evidence challenge, an appellate court sits as the "thirteenth juror." *Prescott* at ¶ 48, citing *Thompkins* at 387.

{¶ 86} Here, appellant argues "the convictions in this matter are against the manifest weight of the evidence because of the obvious lack of the evidence connecting the Appellant with the events that resulted in the deaths of the victims." Appellant relies on many of the same arguments he raised in his first assignment of error to support the contention that his convictions are against the manifest weight of the evidence.

32.

**{¶ 87}** After a thorough review of the record, we cannot say the evidence weighs heavily against a conviction, that the jury lost its way, or a miscarriage of justice has occurred. Appellant's convictions are not against the manifest weight of the evidence. Accordingly, appellant's second assignment of error is not well-taken.

Assignment of error number three: The trial court erred in failing to grant appellant's Rule 29 motion to dismiss at the time of trial.

**{¶ 88}** We review a ruling on a Crim.R. 29 motion for acquittal under the same standard used to determine whether there was sufficient evidence to sustain a conviction. *State v. Merritt*, 6th Dist. Fulton No. F-12-009, 2013-Ohio-4834, ¶ 8. Crim.R. 29 provides that upon a defendant's motion or the court's own motion, after the evidence of either side is closed, the court shall order entry of judgment of acquittal if the evidence is insufficient to sustain a conviction of the charged offense.

**{¶ 89}** For the reasons set forth in our holding under appellant's first assignment of error, we find no merit in appellant's third assignment of error. Accordingly, appellant's third assignment of error is not well-taken.

Assignment of error number four: The trial court erred by failing to grant appellant's motion for change of venue, thereby denying his due process and equal protection rights afforded to him pursuant to the United States Constitution and the Ohio Constitution.

**{¶ 90}** The Supreme Court of Ohio recently reasserted the long-held principle that trial courts have a "'duty to protect' criminal defendants from 'inherently prejudicial

33.

publicity' that renders a jury's deliberations unfair." *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 54, citing *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). The *Mammone* court explained when analyzing whether a trial court erred in denying a change of venue motion, the reviewing court must decide "whether the jury was presumptively prejudiced against [appellant] and, if not, whether [appellant] has established actual juror prejudice." *Id.* at ¶ 57.

### A. Presumed Prejudice

{¶ 91} When considering a claim of presumed prejudice, a reviewing court must weigh all relevant factors. Such factors may include, but are not limited to: (1) the size and characteristics of the community where the crime occurred, (2) whether media coverage about the appellant included "blatantly prejudicial information of the type readers or viewers could not reasonable be expected to shut from sight," (3) whether the passage of time diminished media coverage, and (4) whether the jury's conduct was not consistent with a presumption of prejudice. *Mammone* at ¶ 59, citing *Skilling v. United States*, 561 U.S. 358, 382-383, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010).

{¶ 92} Here, appellant contends the trial court erred when it failed to grant his motion for change of venue. He asserts, "[i]t was clearly pointed out by trial counsel that the Lucas County community had been subjected to numerous news stories in the local press, television and the internet concerning the homicides of Lisa Straub and Johnny Clarke."

34.

{¶ 93} In his February 29, 2012 motion, appellant argued a change of venue was necessary because "pretrial exposure renders it impossible for [appellant] to receive a fair trial before impartial jurors." Attached to the motion were six news articles, two of which mentioned the charges against appellant.

{¶ 94} In an aolnews.com report dated February 2, 2011, the headline reads, "Young Ohio Couple Were Suffocated in Bizarre Homicide." See http://www.aolnews.com/ 2011/02/02/police-young-couple-were-suffocated-in-bizarre-homicide/ (accessed Feb. 27, 2012).

{¶ 95} A truecrimereport.com article, dated February 14, 2011, stated two victims were found "dead on the floor. Their hands were bound with duct tape and plastic bags were over their heads. They appeared to be suffocated to death." See http://www. truecrimereport.com/2011/02/johhny_s_clarke_lisa_straub_fo.php (accessed Feb. 27, 2012).

{¶ 96} An October 11, 2011 article from toledoblade.com set forth appellant had been charged with two counts of aggravated murder, but "he pleaded not guilty to those charges as well as to one count each of kidnapping and aggravated burglary." See http://www.toledoblade.com/Courts/2011/10/11/Second-man-charged-in-couple-s-deaths. php (accessed Feb. 27, 2012).

{¶ 97} Appellant did not present any evidence of the size and characteristics of the Holland area, where the crime happened, or the readership statistics of the online news sources. The articles cited by appellant were dated February 2, 2011 through

35.

November 13, 2011. The matter proceeded to trial in mid July 2012, nearly 18 months after Lisa Straub and Johnny Clarke were found dead and ten months after appellant was indicted.

{¶ 98} The news reports attached to appellant's motion did not exemplify the kind of "inflammatory, prejudicial pretrial publicity [that] so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community." *State v. Hunter*, 1st Dist. Hamilton No. C-090569, 2012-Ohio-2859, ¶ 23, quoting *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir.1980). *Accord State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 86. The reports contain no damaging confession or details about evidence linking appellant to the crimes. *See Rideau v. State of Louisiana*, 373 U.S. 723, 725, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (three jurors who convicted defendant to death had, before being selected to serve on the jury, viewed a television broadcast of defendant's confession). Upon review of the record, we find the media coverage referenced by appellant was not so pervasive that prejudice should be presumed in this matter.

### B. Actual Prejudice

{¶ 99} Having concluded prejudice should not be presumed, we consider whether appellant has established actual prejudice.

{¶ 100} This court has previously held "a careful and searching voir dire provides the best test of whether pretrial publicity has prevented the defendant from obtaining a fair and impartial jury from the locality." (Citation omitted.) *State v. Gravelle*, 6th Dist.

36.

Huron No. H-07-010, 2009-Ohio-1533, ¶ 34. "[A]ctual bias is not established simply by pointing out some degree of media exposure." *Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051 at ¶ 71. A juror will be considered biased if the juror cannot "lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*, citing *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

**{¶ 101}** Here, appellant has failed to identify any seated juror who was biased due to pretrial publicity. During voir dire, two potential jurors acknowledged an inability to make a fair and impartial decision because of pretrial publicity, and both were excused for cause. "The trial judge is 'in the best position to judge each juror's demeanor and fairness' and thus decide whether to credit a potential juror's assurance that he or she will set aside any prior knowledge or preconceived notions of guilt." *Id.* at ¶ 73, citing *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 64.

**{¶ 102}** Upon careful examination of the record, we defer to the trial court's conclusion that the seated jurors could be fair and impartial. There is no evidence before us that any juror was improperly influenced by pretrial publicity. For the forgoing reasons, we find appellant's fourth assignment of error not well-taken.

> Assignment of error number five: The trial court erred in failing to grant defendant's objection to exclude photographs of the deceased and thereby violated his constitutional rights to due process, a fair trial, the right

37.

to confront evidence and the right to be free from arbitrary, cruel and unusual punishment in contradiction to U.S. Constitution, Amendments V, VI, VII, IX and XIV and the privileges granted in the Ohio Constitution.

{¶ 103} Appellant argues the trial court erred when it overruled his objections to two "gruesome photographs." He claims the admission of the photographs was "unnecessary to the proofs of the State's case" and "inflamed the jury to verdict by the prejudicial effect" caused by the photographs' gruesome nature.

{¶ 104} In *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984), paragraph seven of the syllabus, the Supreme Court of Ohio held properly authenticated photographs, even if they are gruesome, are admissible in a capital case if they are relevant, are of probative value in assisting the trier of fact to decide the issues, or are illustrative of testimony and other evidence, so long as the danger of prejudice to a defendant is outweighed by the probative value and the photographs are not repetitive or cumulative.

{¶ 105} Here, the photographs at issue are not particularly gruesome, nor are they repetitive or cumulative. One photograph depicts the internal injuries to Lisa Straub's neck muscles while the other photograph shows the internal injuries to Johnny Clarke's neck muscles. The photographs are relevant and illustrative of the deputy coroner's testimony that the victims suffered trauma to their necks. Upon consideration, we find any danger of material prejudice to the appellant was outweighed by the photographs' probative value. Accordingly, appellant's fifth assignment of error is not well-taken.

38.

Assignment of error number six: The trial court erred in denying the appellant's motion to suppress search of his person, in violation of the appellant's constitutional rights as guaranteed by the Fourth and Fourteenth Amendments.

{¶ 106} Appellate review of a trial court's ruling on a motion to suppress presents a mixed question of law and fact. *State v. Nobles*, 6th Dist. Lucas No. L-10-1172, 2011-Ohio-5041, ¶ 23. With respect to factual matters, the trial court occupies the best position to evaluate the credibility of witnesses and weigh the evidence. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 100. Therefore, the trial court's factual findings must be accepted by the appellate court if the findings are supported by competent, credible evidence in the record. *Id.*, citing *State v. Fanning,* 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982). The trial court's legal conclusions are reviewed de novo by the appellate court. *Roberts* at ¶ 100, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

{¶ 107} Appellant contends the trial court erred when it denied his February 29, 2012 motion to suppress evidence obtained pursuant to a search warrant issued on September 22, 2011. The purpose of the search was to seek appellant's DNA for comparison testing. Appellant asserts there was an inadequate basis for the issuance of the warrant, so any evidence seized should have been excluded at trial.

{¶ 108} The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. *State v. Brown*, 183 Ohio App. 3d 337, 2009-Ohio-

39.

3804, 916 N.E.2d 1138, ¶ 8 (6th Dist.).  A search warrant may only be issued upon a showing of probable cause.  *Illinois v. Gates*, 462 U.S. 213, 238-239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).  Probable cause for a search warrant exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238.

{¶ 109} A person has a legitimate expectation of privacy in his or her bodily fluids.  *Schmerber v. California*, 384 U.S. 757, 770, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).  The expectation of privacy extends to the DNA in a person's cells.  *Smith v. State*, 744 N.E.2d 437, 439 (Ind.2001).  In addition, "using a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search."  *Maryland v. King*, __ U.S. __, 133 S.Ct. 1958, 1968-69, 186 L.Ed.2d 1 (2013).

{¶ 110} A DNA sample is not the same as a DNA profile, as a DNA sample is processed by a specialist in order to obtain the DNA profile.  *State v. Emerson*, 134 Ohio St.3d 191, 2012-Ohio-5047, 981 N.E.2d 787, ¶ 20, *cert. denied*, 133 S.Ct. 1819, 185 L.Ed.2d 833 (2013).  *See also* R.C. 109.573(B)(5) and (H)(2).  After the sample is processed, a record is made of the profile which is separate and distinct from the DNA sample.  *Emerson* at ¶ 20.  Since a scientific process must be performed on a DNA sample by a governmental agent to obtain the DNA profile, and the profile is separate and distinct from the sample, a DNA profile obtained from a DNA sample is the work product of the government.  *Id.*  Thus, a person has no possessory or ownership interest in the DNA profile.  *Id.*

40.

**{¶ 111}** Here, the purpose of the search was to obtain a DNA sample via buccal swab so appellant's DNA could be compared to DNA found at the crime scene. The affidavit in support of the September 22, 2011 search warrant indicated "[o]n January 31, 2011, the bodies of John S. Clarke and Lisa Straub were * * * found bound with duct tape, and plastic bags were placed over their heads which were also bound with duct tape." And, "[a] cigarette butt found in the residence * * * was analyzed by BCI and a CODIS[1] match was obtained identifying Samuel Todd Williams as a major contributor." The affidavit further set forth "[a]dditional standards are required by * * * [BCI] from Samuel Todd Williams for further testing relative to this evidence. A buccal swab from Samuel Todd Williams is needed for such additional testing."

**{¶ 112}** A review of the record shows there is competent, credible evidence to support the trial court's April 16, 2012 denial of the motion to suppress on the basis that there was probable cause for the issuance of the search warrant of appellant's person. The facts in the affidavit in support of the warrant gave the judge issuing the search warrant a substantial basis for concluding a fair probability existed that a sample of appellant's DNA via the buccal swab compared with the DNA evidence on the cigarette butt found at the Straub home would confirm the match obtained from a search of the CODIS system. For the above stated reasons, we find the trial court did not err when it

---

[1] CODIS "is a computerized program designed to house DNA profiles from convicted offenders, forensic samples, suspects, missing persons, unidentified remains and relatives of missing persons in various searchable databases." *State v. Emerson*, 192 Ohio App.3d 446, 2011-Ohio-593, 949 N.E.2d 538, ¶ 10 (8th Dist.), citing Baringer, *CODIS Methods Manual* 3 (5th Rev.2009).

41.

denied appellant's motion to suppress. Appellant's sixth assignment of error is not well-taken.

Assignment of error number seven: The appellant was denied effective assistance of counsel, further denying him the right to due process, equal protection under the law and the right to a fair trial as guaranteed by the U.S. Constitution and the Fifth Amendment, Sixth Amendment, Eighth Amendment, Ninth Amendment and the Fourteen Amendment and those guaranteed under the Ohio Constitution.

{¶ 113} In order to prevail on a claim for ineffective assistance of counsel, appellant must show trial counsel's performance fell below an objective standard of reasonable representation and prejudice resulted from counsel's deficient performance. *State v. Bradley*, 42 Ohio St.3d 136, 137, 538 N.E.2d 373 (1989), paragraph two of the syllabus, *following Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 688.

{¶ 114} Here, appellant argues his trial counsel was ineffective by failing to object to "ordinarily inadmissible and certainly questionable evidence," not challenging the admissibility of testimony and evidence, not requiring the state to "provide proof requisite to secure a conviction," not adequately researching appellant's record and not protecting the rights of the accused.

42.

{¶ 115} Appellant then lists the pages in the trial transcript where trial counsel failed to object to exhibits offered by the state or to jury instructions. Appellant, however, did not articulate any reasons why the exhibits or jury instructions were objectionable or how these alleged errors prejudiced his case.

{¶ 116} Appellant also contends his trial counsel raised few objections during witnesses' examinations, and allowed the state to elicit unchallenged testimony, much of which led to irrelevant and immaterial speculation concerning drug usage and motivation. Again, appellant did not offer any specific instances of ineffectiveness concerning these allegations, much less how the alleged ineffectiveness prejudiced his case.

{¶ 117} In addition, with respect to plea negotiations, appellant argues his counsel was not able to effectuate any meaningful negotiations with the state. Appellant further claims the record is not clear what efforts were made between counsel and client, and counsel and the state. Appellant also alleges there is no indication he was ever informed of the consequences of any potential plea offer and "[t]he lack of a proper record or discussion on this very important issue reflects the lack of care or effort of the trial counsel."

{¶ 118} A review of the record shows there was a lengthy discussion regarding plea negotiations on the record prior to trial. The prosecutor indicated there were preliminary negotiations whereby if appellant was interested in cooperating with the state, there would be further discussions; appellant was not willing to do that. The judge questioned appellant if he was made aware of the possibility of cooperating with the

43.

prosecution for potentially a reduction of the charges he was facing, and appellant acknowledged he was made aware of this possibility on multiple occasions by his attorneys. The judge then inquired of appellant, "you're telling me now that you had absolutely no interest in exploring what the State had proposed in terms of potentially reducing the charges that you are facing?" Appellant replied, "Yes, sir." The court asked appellant again, "you have absolutely no interest in interacting with the prosecutor's office in terms of accepting any potentially less serious charge, correct?" Appellant replied, "No, sir."

{¶ 119} "During plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'" (Citation omitted.) *Lafler v. Cooper*, __ U.S. __, 132 S.Ct. 1376, 1384, 182 L.Ed.2d 398 (2012). "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it." *Id.* at 1387. "It is, of course, true that defendants have 'no right to be offered a plea * * *.' [*Missouri v.*] *Frye*, * * * [__ U.S. __, 132 S.Ct. 1399, 1403, 182 L.Ed.2d 379 (2012)]." *Id.*

{¶ 120} Here, the record shows there was an attempt at plea negotiations between appellant's counsel and the prosecution, but negotiations halted when appellant declined the offer to cooperate with the state in exchange for a potential reduction of his charges. Appellant acknowledged this fact on the record. Appellant has not presented any specific facts evidencing ineffective assistance of counsel with respect to plea negotiations, nor does the record substantiate the allegation that counsel was ineffective.

44.

{¶ 121} In light of the foregoing, there is no evidence in the record that the performance of appellant's trial counsel was in any way professionally unreasonable. Nor is there evidence to support a finding that there is a reasonable probability that, but for trial counsel's alleged errors, the result of the trial would have been different. Therefore, appellant's seventh assignment of error is not well-taken.

<u>Assignment of error number eight</u>: The court erred in allowing the jury to have a portion of the transcript of a witness re-read to them, thereby placing undue emphasis on the testimony and denying appellant a fair trial.

{¶ 122} Appellant asserts the trial court erred when it allowed the court reporter to read to the jury the text message testimony of Alex Cousino after the jury began deliberations.

{¶ 123} The law on this issue is well established. After the jury retires to deliberate, upon a request from the jury, the court, in its sound discretion, may allow all or part of the testimony of any witness to be read to the jury, in the presence of or after notice to the parties or their counsel. *State v. Berry*, 25 Ohio St.2d 255, 267 N.E.2d 775 (1971), paragraph four of the syllabus.

{¶ 124} Here, the trial court did not abuse its discretion in permitting the court reporter to read to the jury Alex Cousino's text message testimony after the jury began its deliberations. Appellant's eighth assignment of error is therefore not well-taken.

45.

Assignment of error number nine: The cumulative effective of the errors committed by the trial court violated the appellant's right to a fair trial and his constitutional rights to due process, the right to confront evidence and the right to be free from arbitrary, cruel and unusual punishment in contradiction to U.S. Constitution, Amendments V, VI, VII, IX and XIV and the privileges granted in the Ohio Constitution.

{¶ 125} "Separately harmless errors may violate a defendant's right to a fair trial when the errors are considered together." *State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000). In order to consider whether cumulative error is present, there must first be a finding that multiple errors were committed at trial. *Id.* Then, there must be a finding that there is a reasonable probability the outcome of the trial would have been different but for the combination of the separately harmless errors. *State v. Moreland*, 50 Ohio St.3d 58, 69, 552 N.E.2d 894 (1990).

{¶ 126} Here, the record does not support, nor has there been a finding of multiple, prejudicial errors at appellant's trial. Since no such errors were committed, appellant's ninth assignment of error is without merit.

Assignment of error number ten: The trial court erred to the prejudice of Mr. Williams when it ordered him to pay unspecified costs, including fees, without first determining the ability of pay those costs.

46.

{¶ 127} R.C. 2947.23(A)(1)(a) provides "[i]n all criminal cases * * * the judge * * * shall include in the sentence the costs of prosecution, including any costs * * * and render a judgment against the defendant for such costs."

{¶ 128} Since costs are assessed at sentencing and are included in the sentencing entry, a defendant must move the trial court to waive payment of costs at the time of sentencing. *State v. Threatt*, 108 Ohio St.3d 277, 2006-Ohio-905, 843 N.E.2d 164, ¶ 23. "If the defendant makes such a motion, then the issue is preserved for appeal and will be reviewed under an abuse-of-discretion standard. Otherwise, the issue is waived and costs are res judicata." *Id.*

{¶ 129} Here, at the sentencing hearing, the trial court judge ordered appellant to pay all costs of prosecution. Appellant did not move the trial court to waive costs. Since appellant did not preserve this issue for appeal, it is barred by the doctrine of res judicata. *Threatt, supra. See also State v. Dalton*, 6th Dist. Williams No. WM-10-011, 2011-Ohio-362, ¶ 10. Accordingly, appellant's tenth assignment of error is found not well-taken.

{¶ 130} Having found the trial court did not commit error prejudicial to appellant, the judgment of the Lucas County Court of Common Pleas is affirmed. Pursuant to App.R. 24, appellant is hereby ordered to pay the court costs incurred on appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                         _____
                                                          JUDGE

Thomas J. Osowik, J.

                                          _____
Stephen A. Yarbrough, P.J.                            JUDGE
CONCUR.

                                          _____
                                                          JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.

48.